\_\_\_ FILED \_\_\_ ENTERED
\_\_\_ LOGGED \_\_\_ RECEIVED

4:03 pm, Oct 19 2023

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ Deputy

## ATTACHMENT A
## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, the Offices would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

Larry Allen VICKERS, (hereinafter, the defendant or "VICKERS"), age 60, is a resident of Charlotte, North Carolina.

### Firearms – Count One

At times relevant to Count One of the Superseding Information, VICKERS was the owner of the firearms-related business VT Guns, Inc. (formerly Vickers Tactical, Inc.), located in North Carolina. VICKERS and his businesses were Federal Firearms Licensees ("FFLs") and Special Occupational Taxpayers ("SOTs"), which were authorized, in certain circumstances, to possess, manufacture, and deal in machineguns and other National Firearms Act ("NFA") firearms. VICKERS was also an internet personality known for his extensive knowledge of firearms and related merchandise. VICKERS operated a YouTube channel with many subscribers, on which he reviewed firearms, including many very rare firearms. VICKERS also offered highly sought-after firearms training courses in various locations across the country. Most trainings were priced at over $500, and some were priced at more than $1,000.

Codefendant[1] Sean Sullivan ("Sullivan") was the principal owner and operator of Trident, LLC ("Trident") (formerly Trident Rifles, LLC), located in Gambrills, Maryland. Sullivan was also affiliated with B&T USA LLC, located in Tampa, Florida. Sullivan and Trident were FFLs SOTs. Sullivan was also an Intelligence Analyst with the Department of Homeland Security, Homeland Security Investigations ("HSI") while simultaneously operating Trident.

Codefendant Matthew Jeremy Hall was the Chief of Police of the Coats Police Department in Coats, North Carolina, from approximately 2012 to mid-2020, when he retired. Codefendant James Sawyer was the Chief of Police of the Ray Police Department in Ray, North Dakota, a position he held since at least 2015.

Between in or about June 2018 through in or about March 2021, VICKERS knowingly conspired and agreed with codefendants, Sean Sullivan, Matthew Jeremy Hall, James Sawyer, and others: to defraud the United States, namely the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), by interfering with and obstructing the lawful government functions of the ATF to restrict the transfer, possession and/or importation of machineguns and other firearms; to unlawfully import and cause to be imported into the United States NFA and Gun Control Act ("GCA") regulated firearms using false and fraudulent writings submitted to the ATF; to

---

[1] The use of codefendant in this Statement of Fact identifies individuals who are charged along with VICKERS in the Indictment in 23-cr-0257-JRR [DMD].

Rev. August 2018

knowingly make and cause to be made, and use and cause to be used, in a matter within the jurisdiction of the ATF, representations with respect to information, relating to the acquisition of firearms; to knowingly make and cause to be made, and use and cause to be used, in a matter within the jurisdiction of the ATF, materially false, fictitious, and fraudulent statements and representations, namely law letters signed by defendants HALL, and Sawyer, requesting the demonstration of machineguns and/or short-barreled rifles; and to unlawfully possess machineguns.

VICKERS and his codefendants sought to and acquired machineguns and/or other restricted firearms by falsely representing that the firearms would be used as dealer sales samples for demonstration to law enforcement offices, specifically the Coats Police Department and the Ray Police Department. These false representations were contained in law letters on Coats Police Department letterhead and Ray Police Department Letterhead. Codefendant Sullivan would submit the law letters containing materially false information with ATF Forms 6, to obtain permits from the ATF to import the otherwise prohibited machineguns and other restricted weapons into the United States.

Sullivan would import into the United States the machineguns and restricted weapons from manufacturers and sources outside the United States, then transfer some of the weapons to defendants VICKERS, and others while keeping some of the machineguns and other restricted weapons he imported in the Trident inventory for later transfer and/or retention for his personal use.

Defendant VICKERS kept some of the machineguns and other restricted weapons that were transferred to him in his personal collection and transferred other machineguns and restricted weapons to other FFLs and third parties.

Codefendants Hall and Sawyer signed law letters in which they typically requested demonstration of machineguns and firearms for possible future purchase for the use of officers in the performance of their official duties. The letters also stated that the weapons were particularly suitable for use as law enforcement weapons due to cost and availability.   At the time that they signed the law letters, defendants HALL and Sawyer had no expectation or understanding that such weapons would ever be demonstrated to their respective law enforcement agencies. Moreover, Defendant VICKERS and codefendant Sullivan likewise knew that these law letters were fraudulent from the inception of their creation.

Between in or about July 2012, to in or about May, 2020, HALL signed and submitted approximately 53 law letters that requested demonstration of 92 firearms, of which number approximately 29 firearms were imported by Sullivan.

Between in or about August 2015, to in or about August 2020, Sawyer signed and submitted approximately 32 law letters that requested demonstration of approximately 73 firearms, of which number approximately 21 firearms weapons were imported by Sullivan.

For the most part, the conspiracy operated by the use of fraudulently false "dealer sales sample" letters, otherwise known as "demo letters" or "law letters: that were submitted to the ATF as attachments to ATF Forms 6 seeking exemptions to what otherwise would be proscriptions on the importation of machineguns and other types of firearms.

Among the many overt acts in furtherance of this conspiracy occurring in the District of Maryland and elsewhere are the following:

On or about August 6, 2018, the following electronic communication took place between Sullivan and VICKERS and VICKERS and Sawyer:

> Sullivan to VICKERS:  Would you mind getting your chief to do a demo letter for me for a couple prototypes from Karl?
> VICKERS to Sullivan:  I'll certainly try Let's give it's shot
> VICKERS to SULLIVAN:  Also can you email me what exactly you want on your demo letter?
> Sullivan to VICKERS:  Just did.
> VICKERS to Sullivan:  Got it  I'm pinging my LE guy now …..
> VICKERS to Sawyer:  Chief My importer- who is a great guy, former Marine and has really done me Solid- asked me to ask you if you could do a demo letter for him As a favor to me I'd like to ask you to do it- normally I'd never ask for Anyone else but he has went above and beyond for me If your good with it I sent the letter template he needs to your email
> Sawyer to VICKERS:  I never would either. However as a personal favor to you I'll make this one time exception. You are the only one I've ever done these for because I consider you a good friend brother.
> VICKERS to Sawyer:  Thanks I really appreciate it Consider this a one time occurrence  One and Done
> Sawyer to VICKERS:  You got it brother.
> Sawyer to VICKERS:  He owes you one now!
> VICKERS to Sawyer:  Yep !! He has really went above and beyond for me or I would have never asked !!
> Sawyer to VICKERS:  Understood glad I can help bro
> VICKERS to Sawyer:  Thanks!!
> VICKERS to Sullivan:  Hey my guy says he will do it for you this once no problem
> Sullivan to VICKERS:  Thanks. And tell him it's much appreciated
> VICKERS to Sullivan:  Will do !

On or about August 8, 2018, Sawyer signed a law letter on Ray Police Department letterhead, addressed to Trident Rifles, LLC, in Odenton, Maryland, requesting demonstrations of a B&T AG APC9K, Cal. 9mm, "Submachinegun" [sic], a  B&T AG APC9KSD, Cal. 9mm, Submachinegun [sic], a B&T AG APC40, Cal. 40 S&W, "Submachinegun" [sic], and a B&T AG GHM9K, Cal. 9mm, "Submachinegun" [sic], "for possible future purchase and use of our officer in the performance of his official duties"

Rev. August 2018

On or about August 9, 2018, Sullivan attached Sawyer's August 8, 2018, law letter, to and in support of his request to ATF for an exemption to import a B&T AG APC9K, Cal. 9mm, machinegun, a B&T AG APC9KSD, Cal. 9mm, machinegun, a B&T AG APC40, Cal. 40 S&W, machinegun, and a B&T AG GHM-Police, Cal. 9mm, machinegun APC40 machine.

On or about November 20, 2018, Sullivan filed an ATF Form 6A with ATF's Imports Branch indicating he had imported a APC9KSD machinegun with serial number US18-28612. On or about March 14, 2020, Sullivan filed an ATF Form 6A with ATF's Imports Branch indicating he imported a B&T AG APC40 machinegun having serial number US19-33205.

On or about June 27, 2018, SAWYER signed a law letter on Ray Police Department letterhead, addressed to Vickers Tactical, requesting demonstrations of a CG-Haenel CR 223 short-barreled rifle and a CG Haenel CR 308 short-barreled rifle, among other weapons.

On or about June 27, 2018, VICKERS signed a letter on Vickers Tactical Inc. letterhead, addressed to Trident Rifles LLC in Odenton, Maryland, stating the firearms enumerated in paragraph 28.j. above would be used in a demonstration to the Ray Police Department by Vickers Tactical Inc.

On or about July 6, 2018, Sullivan submitted an ATF Form 6 to ATF's Imports Branch requesting permission to import the firearms enumerated in paragraph 28.j. above. Sullivan represented in Block 10 of the ATF Form 6 that the purpose of the importation was "Dealer Sales Sample Letter" and attached SAWYER's aforementioned June 27, 2018 law letter and VICKER's aforementioned June 27, 2018, letter.

On or about June 5, 2019, the following electronic communication took place between Sullivan and VICKERS:

> Sullivan: Do you want the haenel's?
> Sullivan: Got 1x556 and 1x308 for you if you want
> VICKERS: No I'll skip them  You can have them if you want
> Sullivan: Copy

On or about July 20, 2019, Sullivan filed an ATF Form 6A with ATF's Imports Branch indicating he had imported a CG-Haenel CR 223 short-barreled rifle having serial number CR004170 and a CG-Haenel CR 308 short-barreled rifle having serial number CR3-000597.

On or about August 25, 2019, username "Trident Rifles LLC" posted the following advertisement on sturmgewehr.com, an internet firearms marketing site:



## IEEPA Conspiracy – Count Two

On July 16, 2014, the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC") designated JSC Kalashnikov Concern, along with several related entities and aliases (individually and collectively, "Kalashnikov Concern"), as a Specially Designated National ("SDN"). Kalashnikov Concern was designated pursuant to Executive Order 13661 for operating in the arms or materiel sector of the Russian Federation. In relevant part. Section 4(a) of Executive Order 13661 prohibits U.S. persons from making "any contribution . . . of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to this order." Additionally, Section 4(b) of Executive Order 13661 prohibits U.S. persons from receiving "any contribution or provision of funds, goods, or services from any such person," while Section 5(b) prohibits any "conspiracy formed to violate any of the prohibitions set forth in [Executive Order 13661]."

VICKERS knew by no later than July 2014 that Kalashnikov Concern had been sanctioned, that its property and interests in property in the United States had been blocked, and that U.S. persons like himself were prohibited from providing funds, goods, or services to Kalashnikov Concern and from receiving funds, goods, or services from Kalashnikov Concern. For example, in or about May 2014, approximately two months before Kalashnikov Concern was sanctioned, VICKERS messaged a business associate, Person 1, to say that he knew sanctions against Kalashnikov Concern were a possibility, noting that "my [videography] crew doesn't want to [film videos at Kalashnikov Concern because] they are scared with all the sanctions bullshit; I want to do it but I can't film alone." Similarly, on or about July 31, 2014, approximately two weeks after Kalashnikov Concern was sanctioned, Person 1 informed

VICKERS that "the sanctions have fucked my work for the past 9 months so we are having to regroup and drive in a different direction."

Nevertheless, beginning no later than July 2014 and continuing until at least March 2021, VICKERS and others conspired, orchestrated, and carried out a plan to violate and evade the U.S. sanctions against Kalashnikov Concern by: (a) acquiring firearms, firearms parts, blueprints, and technical plans from Kalashnikov Concern; (b) providing promotional videography and marketing services to Kalashnikov Concern; (c) receiving services including engineering and technical design services, videography and video editing services, and preferential access to Kalashnikov Concern firearms, facilities, technical processes, personnel, and associates; and (d) receiving funding and reimbursements from and on behalf of Kalashnikov Concern. A key goal of this plan was to develop a U.S. business that would manufacture Kalashnikov-style firearms to be sold in the U.S. market and fill the gap left by the sanctions against Kalashnikov Concern.

In or about August 2014, Person 1 began pitching a new business that he called "American Kalashnikov," in which Person 1 would serve as the CEO, VICKERS would serve as the Director of Firearms Testing and Evaluation and the company spokesman, and a Russian engineer named Person 2 would serve as the Chief Operations Officer. In the fall of 2014 and during 2015, Person 1 sought capital investments from individuals acting on behalf of Kalashnikov Concern, including its Chief Executive Officer/Director-General Person 3. During this period, Person 1 also sought and obtained approval from these individuals, who were acting on behalf of Kalashnikov Concern, to appoint Person 1 as CEO of the new company and to secure equity shares in the new company for Person 1 and VICKERS. Based on his discussions with Person 1, VICKER S was aware that: (1) the new business required substantial capital, (2) Person 1 was making efforts to secure VICKERS an equity share in the new business, (3) Person 1 had proposed VICKERS to serve in the new business as the Director of Firearms Testing and Evaluation and as Company Spokesman, and (4) VICKERS knew and agreed that he and Person 1 would be working together with Person 2 on the new business.

Throughout 2015 and into 2016, individuals acting on behalf of Kalashnikov Concern provided Person 1 and VICKERS with preferential access to Kalashnikov Concern facilities, and, in September 2015, the CEO of SDN Kalashnikov Concern flew to North Carolina on a private jet to recruit VICKERS to act as a consultant for the new "American Kalashnikov" venture. Within months, VICKERS started to receive monthly consulting fee payments from Company 1, a U.S. company that, during the pre-sanctions period, had entered into an exclusive agreement to distribute Kalashnikov Concern firearms in the United States. For the period of November 2015 until July 2016, these payments totaled at least $46,000.

To facilitate Company 1's manufacturing activities, Person 1, Person 2, Person 3, VICKERS, and others developed and carried out a plan to obtain blueprints, technical data, engineering services, firearms, and firearms parts from Kalashnikov Concern for use in Company 1's domestic manufacturing. To do so, they: (a) secured Person 2 a position as an engineer at Kalashnikov Concern to obtain blueprints and other technical data from Kalashnikov Concern and to provide engineering and other services, including scanning, converting,

translating, editing, revising, and transmitting these blueprints and plans to Company 1; and (b) sought and obtained firearms and firearms parts from Kalashnikov Concern. In each case, Person 1, VICKERS, and others acted with the knowledge and approval of senior Kalashnikov Concern personnel. For example, Kalashnikov Concern's CEO (Person 3) and head of engineering, Person 4, knew of and authorized Person 2's appointment at Kalashnikov Concern and Person 4 was personally involved in providing blueprints to Company 1. Similarly, Kalashnikov Concern's head of marketing, Person 5, acting with Person 3's approval, repeatedly assisted VICKERS in obtaining firearms and firearms parts from Kalashnikov Concern. Person 1 and VICKERS recognized that their access to Kalashnikov Concern facilities, personnel, technical data, firearms, and firearms parts provided them with a significant competitive advantage over other U.S. companies seeking to manufacture Kalashnikov-style firearms.

From at least July 2015 until August 2018, VICKERS, Person 1, and others also agreed and conspired to provide promotional videography and marketing services – which VICKERS and his production company valued at between $10,000 and $200,000 – to Kalashnikov Concern and to receive services from Kalashnikov Concern in the form of videography and video editing services, the reimbursement of travel expenses, and preferential access to Kalashnikov Concern firearms, facilities, technical processes, personnel, and associates.

Relevant communications between VICKERS and Person 1, Person 5, Person 2, and others include contemporaneous encrypted messages sent and received by VICKERS between no later than October 2013 and at least July 2021. During the relevant period, VICKERS was the registered user of the phone number XXX-XXX-4829 and the associated WhatsApp account and all messages sent and received from that account were sent or reviewed by him.

Messages showing that VICKERS knew of the sanctions against Kalashnikov Concern include the following:

1.     On July 31, 2014, Person 1 told VICKERS that "Obviously the sanctions have fucked my work for the past 9 months so we are having to regroup and drive in a different direction." The Defendant responded "No doubt."

2.     On November 26, 2014, VICKERS messaged Person 1 asking "Only Kakashnikov/Izhmash [sic] is banned here correct?" Person 1 responded "Correct."

3.     On April 8, 2017, Person 1 messaged VICKERS to say "[Person 3] says don't worry when sanctions end… the first flight out will contain our guns." Vickers responded "Nice!!"

Messages showing that, despite having knowledge of the sanctions imposed on Kalashnikov Concern, VICKERS, Person 1, and others sought to acquire firearms and firearms parts include, but are not limited to, the following:

4.     On November 8, 2014, Person 1 asked VICKERS "is there anything from here [Kalashnikov Concern] you want me to get or keep an eye out for you?" The Defendant

responded "Definitely the SV98 scope." As Person 1 and VICKERS knew at the time, the SV98 was manufactured by Izhmash/Kalashnikov Concern.

5. On February 5, 2015, VICKERS messaged Person 1 to "feel them out [referring to Kalashnikov Concern] on me getting some AN-94 parts to restore mine while I am there." As Person 1 and VICKERS knew at the time, the AN-94 was manufactured by Izhmash/Kalashnikov Concern. Person 1 replied, "Shouldn't be a problem. What do you need?" The Defendant said "I'll get you a list" and provided a list of parts including a bolt, a gas block, a gas piston, and a barrel.

6. On March 19, 2015, VICKERS told Person 1 "Gotta get AN-94 parts." Person 1 responded "They [Kalashnikov Concern] have a total of 2 working models….the one we shot that broke when you were here and the one I shot in Izhevsk." That same day, VICKERS asked Person 1 "Can we get mags, furniture, etc. from Russia? More authentic and cost effective?"

7. On October 12, 2019, VICKERS messaged Person 5 to confirm that he had received firearms parts from Kalashnikov Concern, noting that "2 more packages arrived." Person 5 responded "Great! Today I finally had a day of and paid the last shipping bills for your parts. Here is the breakdown: You sent a $1000[.] AK12 $300 AK105 $250[.] The guy who cuts them up charges a shitload of money for cutting/disassembling/'packing', so we had a deal that I pay him with another AK-105 MMG, which saved us some money AK105 $250 (payment for cutting/disassembling/greasing up some palms)[.] Shipping Moscow-Perm-USA total $200. I have your Bizon mag I assembled from two mags … I paid about $600 for it. Expensive, but at least it is not $900 I had to pay before[.] If you can, please send about $700 (mag+shipping)." The Defendant responded "Yessir Will do."

Messages showing VICKERS, Person 1, and others—despite having knowledge of the sanctions imposed on SDN Kalashnikov Concern and that Person 2 was being paid by the same—sought (1) to acquire blueprints, technical plans, and other intellectual property that belonged to SDN Kalashnikov Concern from Person 2, and (2) to receive engineering services from Person 2 include, but are not limited to, the following:

8. On October 23, 2014, VICKERS wrote to Person 1 that "The Russians fuck around and fuck around – watch an American company reverse engineer the AK-12 off Internet pics!!!!!" Person 1 responded "Why? I can get the plans. [Grinning emoji]"

9. On November 26, 2014, Person 1 wrote to VICKERS that "This [Person 2] guy I have (not the billionaire) is the real deal and we all as a collective could really make this work…with or without outside money…. The and and ideas [sic] are just too good to ignore. The plans…." The Defendant responded, "I agree[.] The market here in the US is DYING for this cool newer Russian stuff[.] As you know…. As you know companies here in the US are getting ready to release home grown AK's to the market – my guess is that will be a common them at SHOT [the annual firearms industry convention]…. But your connections to get plans [meaning blueprints and technical data] trumps everyone and puts us in the catbird seat."

10. On February 15, 2015, Person 1 told VICKERS "Getting to join [Person 3] on his private train to Izhevsk. Hit you when on the train…. Let's see if I can scrounge up some parts. Or at least arrange for later." The Defendant responded Yep I can get you a list together asap if you want." Person 1 replied "Do it." The Defendant then responded with a series of firearms parts including parts for the AN94 firearm [manufactured by Kalashnikov Concern/Izhmash] including, inter alia, a compete bolt with firing pin and extractor, a gas piston, a gas block, a barrel, a sliding hammer, an internal receiver or trunnion, Person 1 informed VICKERS that "They are already been letting me see [sic] photos or docs or drawings of all sorts of new shit" and responded to VICKERS's list of parts by saying "I'll see what I can do. Some of these we may be able to make in the US. 😊" The Defendant responded, "Yep With blueprints!!!"

Messages showing VICKERS, Person 1, and others conspired to provide promotional videography and marketing services, include, but are not limited to, the following:

11. On February 5, 2015, Person 1 told VICKERS "I think I got the deal going to get you tied in with a little equity too…. And a go with filming with REASONABLE expenses paid…." Vickers responded "Yeah" and told Person 1 to tell a member of Defendant's video production team that up front.

12. On July 9, 2015, VICKERS provided Person 1 with proposed pricing for videography/editing services to be relayed to Kalashnikov Concern, quoting prices of "10k for review, 15k for extended version." Person 1 replied to confirm "That includes everything? Filming, editing, you, etc?" Defendant responded "Yes that's everything[.] He can use it for marketing, etc. Here's the catch however – I need a gun ASAP and if it's a piece of shit the deal is off[.] I can't do a video on a total dog."

13. On April 16, 2018, Person 5 wrote to VICKERS "Hello Larry! Some of my colleagues are worried that you did not post the video. I explained them, that nobody in his right mind posts on the weekend, but they are still worried." The Defendant responded "We will post This week[.] Tell them that posting something on the same general topic every day greatly lessens the impact[.] Notice how toward the end of my trip I got very little notice on my Kalashnikov posts on social media. Also tell them that we will post every one – most likely one a week to get maximum exposure." Person 5 acknowledged that "I think you have much better grasp on how to work on social media." The Defendant agreed that "I have 941,000 people who follow me across all my 'Vickers' branded social media platforms." Person 5 replied "Exactly. And we have less than 90 000 across all platforms. 10 times less. Sorry I have to bother you with that. Shit like that drives me crazy about this company…"

None of the individuals or entities with whom VICKERS, Person 1, and others conspired obtained a necessary authorization or license from OFAC before providing funds, goods, or services to SDN Kalashnikov Concern and receiving funds, goods, or services from SDN Kalashnikov Concern. Throughout the period beginning in July 2014 and continuing until at least March 2023, VICKERS, Person 1, and others understood that it was unlawful and in violation of

sanctions to provide funds, goods, or services to SDN Kalashnikov Concern and to receive funds, goods, or services from SDN Kalashnikov Concern.

SO STIPULATED:

__Oct 19, 2023__
~~August 16, 2023~~
Date

P. Michael Cunningham
Assistant United States Attorney

__Oct 19, 2023__
~~August 16, 2023~~
Date

Menno Goedman / SO
Menno Goedman
Trial Attorney

__Oct 19, 2023__
~~August 16, 2023~~
Date

Sean O'Dowd
Trial Attorney

__10-19-23__
Date

Larry Allen VICKERS
Defendant

__10.19.23__
Date

Gerald C. Ruter, Esquire
Counsel for Defendant

Rev. August 2018

10